THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MICHAEL ROLSTON, Appellant.

Second Department, March 12, 1979

618

## APPEARANCES OF COUNSEL

*Koopersmith, Feigenbaum & Potruch (Alexander Potruch, Kenneth Koopersmith* and *Michael K. Feigenbaum* of counsel), for appellant.

*John J. Santucci, District Attorney (Charles N. Walsh* and *Nicholas Marotta* of counsel), for respondent.

## OPINION OF THE COURT

SHAPIRO, J.

Appellant pleaded guilty to robbery in the second degree, subsequent to the denial of his motion to suppress evidence of his confession as well as his possession of a gun. The People concede, on this appeal, that evidence of the possession of the gun should have been suppressed. The main issue, then, is whether "there is a reasonable possibility that the error contributed to the plea" (see *People v Grant,* 45 NY2d 366, 379). We cannot determine whether that error motivated the proffering of the plea and, therefore, the judgment of conviction should be reversed.

### THE FACTS

Appellant, Michael Rolston, and his codefendant, Richard Day, were indicted for robbery in the first degree for forcibly

stealing a sum of money from a cashier in a restaurant in Queens on August 10, 1976, while displaying what appeared to be a pistol, rifle or other firearm. Both men pleaded guilty to robbery in the second degree after a motion to suppress evidence of the gun and confessions which each had made to the police was denied. Codefendant Day has taken no appeal from the judgment of conviction against him.

### THE ROBBERY

From the confessions of appellant and his codefendant, the following appears:

On August 10, 1976, at about 10:30 or 11:00 P.M., appellant and Day walked into a Kansas Fried Chicken establishment on Northern Boulevard in Queens and robbed the cashier, Rohit Shah, of a sum of money. The appellant held a gun on the cashier while Day took money from the cash register. An accomplice, one Samuel Atkins, was waiting for them in an automobile parked outside the store. Atkins' mother owned the car. After the robbery appellant and Day went into the Atkins vehicle and rode away.

### THE EVENTS IN NEW YORK COUNTY

Several hours later, at about 1:45 A.M. on August 11, 1976, Police Officers Roy McAndrews and John Quinn, both in uniform and patrolling in a marked police vehicle, observed Day, Atkins and appellant walking along Manhattan Avenue near 117th Street, in what was conceded to be a "high-crime drug area". At the suppression hearing Officer McAndrews testified that among the things which aroused his suspicion was the fact that appellant, when the officers pulled up, "abruptly turned back like he wasn't a member of the group". He then saw appellant and his companions enter the Atkins automobile at 116th Street. The car proceeded south on Manhattan Avenue. The police vehicle followed it and caused it to stop at 113th Street. Officer McAndrews' explanation was that from a point about a car length away the officers saw "a lot of action inside the car which aroused [their] suspicions" and they "saw, I believe, Rolston trying to put something under the seat. It appeared at our vantage point like he was trying to hide something." He also, noted that there was "a lot of jostling in the car, a lot of moving." The driver of the police vehicle flashed the lights of the car at which point Officer

McAndrews saw what he assumed to be "narcotics being thrown from the window". These were two envelopes which "appeared to be white in nature, a glassine envelope, containing a white substance." However, when asked by the court whether he "could see the white substance in the envelope", the officer answered, "They looked like two white pieces of paper. I took it for granted it was glassine envelopes with alleged heroin." This ejection took place near 114th Street, but the Atkins vehicle did not respond to the flashing police lights until a block later. After it came to a halt, with the police car parked behind it, McAndrews went up to the occupants "to cover them", while Officer Quinn went back to the area in which the papers had been tossed. He recovered a glassine envelope filled with a white substance and waved it at McAndrews, who understood that to mean that it was an envelope containing drugs.

McAndrews ordered the occupants out of the car. Codefendant Day was in the driver's seat, Atkins was in the front passenger seat and appellant was alone in the rear seat. McAndrews testified that when the front left door was opened he saw a pistol in the back seat; he took possession of it and then made the arrests.

At the station house to which Day, Atkins and appellant were transported, there was an altercation, in the presence of appellant, between Officer McAndrews and Day as a result of which Day was taken to Sydenham Hospital where he received five stitches in the head. Day testified at the suppression hearing in this case that McAndrews, in response to Day's accusation that the gun had been planted in the car by the police, "asked me do I really think he spent $50 to put a gun in the car. And I simply said 'I heard of police officers doing that.' That's when he took out his black jack, hit me in the head and started kicking me and physically abusing me." McAndrews' testimony was that Day was removed to the hospital "[b]ecause I used necessary physical force on him." When asked whether that included a blackjack, he answered, "I don't recall at this time what I used. I know he suffered injury to his head—five stitches—because of my actions." Appellant testified that he, too, had been assaulted, by Officer McAndrews' partner. The testimony as to this alleged incident is set forth in the following colloquy:

"Q What was the nature of the assault?

"A He [Officer Quinn] asked the sergeant 'Why don't you go

downstairs and get some coffee.' A couple of minutes after that, they both asked me to come out of the cell.

"They accompanied me into a private room where Officer McAndrews' partner took off his belt with his gun, handed it to McAndrews and proceeded to, you know, start swinging at me.

"Q What part of your body did he strike?

"A My head. He was trying to hit me in my head."

### THE PROCEEDINGS AS TO THE MANHATTAN ARRESTS

From the limited record before us relating to the criminal proceedings in New York County (and from statements in the People's brief as to the official records in the New York County proceedings, which appellant does not contest) it appears that appellant and Day were charged with possession of heroin and a weapon, and that appellant retained counsel. On August 12, 1976 the drug charge against appellant was adjourned in contemplation of dismissal and, on February 15, 1977, it was dismissed. On December 15, 1976 a felony weapons charge was referred to the New York County Grand Jury but no indictment was returned. On May 20, 1977 the weapons charge was dismissed with prejudice.

### THE ARRESTS FOR THE ROBBERY

On September 11, 1976, one month after the Manhattan arrests, appellant and Day were arrested at their homes in Queens. They were advised of their rights, told that they were charged with robbing the cashier at the Kansas Fried Chicken establishment on Northern Boulevard in Queens during the evening of August 10, 1976 and brought to the 112th Precinct in Queens. There Detective Jones obtained a signed waiver of *Miranda* rights from each of them and (during a tape-recorded interview) they stated that they were willing to discuss the robbery without an attorney being present. Appellant, in his recorded confession, in pertinent part, stated: "We were in a car approaching on Northern Boulevard, Kansas Fried Chicken. Ricky Day and myself entered the place. I held the gun on the cashier as Ricky Day jumped over the counter to get the money out of the register. After he got the money out of the register we left in a car and we proceeded to Manhattan." When asked, "Who was driving the car?", appellant replied, "Samuel Atkins."

THE POSTARREST PROCEEDINGS IN QUEENS COUNTY

The appellant and Richard Day were indicted in Queens for robbery in the first degree. In November, 1976 appellant moved, *inter alia,* to suppress both the confession and the gun which had been seized in the course of the Manhattan arrest.

After the hearing the motion to suppress was denied. The hearing Justice stated:

"Accordingly, the motion to suppress the gun is denied as the gun was in plain view of the police officer when he stopped the vehicle.

"Insofar as the admissions are concerned, their rights were made known to the defendants but *[sic]* read to them. And I believe in evidence is *[sic]* the signatures of both of them as to the Miranda warnings. Under the circumstances, the Court finds that the admissions were voluntarily made and, accordingly, the Court denies that motion."

On February 3, 1977 the Queens County District Attorney served notice upon appellant that he intended to offer the testimony of a witness (name not stated) who had made a photographic identification of the appellant on September 2, 1976 (nine days before the Queens arrests). Neither appellant nor Day requested any further information, nor did either of them move for any hearing thereon.

On May 9, 1977 appellant and Day withdrew their pleas of not guilty and entered guilty pleas to robbery in the second degree before Mr. Justice DUBIN. Appellant stated that he was not threatened or forced to take the plea. Counsel for both the appellant and the codefendant were present. Bail was continued.

On June 30, 1977 Mr. Justice DUBIN sentenced appellant to an indeterminate prison term with a maximum of five years.

I. AS TO ADMISSIBILITY OF APPELLANT'S CONFESSION

Appellant asserts that he was represented by counsel in the New York County proceedings which were still pending against him, at least as to the felony weapons charge, at the time of his custodial interrogation in Queens on September 11, 1976. He argues, therefore (based on *People v Townes,* 41 NY2d 97, 102), that "[a]n incriminating statement obtained from a Defendant *after* a lawyer has entered the proceedings are *[sic]* inadmissible if procured by custodial interrogation in the absence of counsel". He alleges that since the investiga-

tions in the two counties "revolve around the same gun" he was in fact represented by counsel at the time he made the confession.

■ Since this issue was not raised at the suppression hearing, it was not preserved for review (see CPL 470.05, subd 2). But, even if it had been preserved, there is no evidence in the record: (1) that appellant was indeed represented by counsel at the time he made the confession in Queens; (2) that Detective Jones was told or knew that appellant had counsel relating to a felony weapons charge in another county; or (3) that Detective Jones was not pursuing a separate, good faith investigation into the robbery in Queens.

■ Appellant's contention, in effect, is that a suspect cannot validly waive his right to have counsel present during custodial interrogation if there exists, *anywhere,* a pending criminal proceeding against him, the only common feature of which is the possession of the same gun. Under the facts of this case we hold that the two proceedings were unrelated and directed towards different criminal activity. In New York County it was for *possession* of a gun, as well as of drugs, and there is no indication that the police in New York County knew of the *use of a gun* in a robbery attempt in Queens a few hours earlier. As stated in *People v Clark* (41 NY2d 612, 615): "Representation by counsel in a proceeding unrelated to the investigation is insufficient to invoke the protection [of the Sixth Amendment] [n]or * * * does the presence of counsel immunize the defendant from normal, good faith, investigation which occurs after indictment[1] and is unrelated thereto and directed toward other criminal activity".

Even if it were a fact that the Queens police, in the course of their investigation, may have learned of the Manhattan arrests of a month earlier, such knowledge would not make the two incidents so interwoven as to preclude questioning by the Queens police of the facts with respect to the Queens robbery (see *Brown v Illinois,* 422 US 590, 603-604; *People v Martinez,* 37 NY2d 662, 666-667[2] and cf. *People v Carl,* 46 NY2d 806, 807).

---

1. Here the investigation was prior to the indictment, which makes *People v Clark* (41 NY2d 612) applicable a fortiori.

2. Respondent's brief indicates that a witness to the robbery had noted the license plate number of the Atkins automobile which led to the questioning of Samuel Atkins and that, based thereon, a detective displayed photographs to the complaining witness from which he identified appellant on September 2, 1976, nine days before his arrest. Respondent also points out that in the course of the colloquy at the end of the suppression hearing "the Assistant District Attorney did state and indicate, on the

Appellant further argues (albeit for the first time on this appeal) that his memory of the beatings that had been inflicted upon him and Day at the time of the New York County arrests "was still fresh when [he] was arrested and taken from his home in Queens County." He was also aware that the same gun was involved in both investigations. These were the reasons, he asserts, why he confessed to the Queens robbery. His thought association relating to the gun, when combined with the memory of the alleged assaults, asserts appellant, were "such that an ability to make a choice whether or not to make such a statement was completely undermined."

A motion to suppress "must be in writing and upon reasonable notice to the people and with opportunity to be heard. The motion papers must state the ground or grounds of the motion and must contain sworn allegations of fact * * * supporting such grounds" (CPL 710.60, subd 1; see, also, CPL 710.60, subd 3). Here, the only ground contained in the moving papers was that appellant "was not properly advised of his constitutional rights prior to his making any statement." The People met their burden on this contention by demonstrating, in their direct case at the hearing, a voluntary waiver of *Miranda* rights and appellant made no attack upon that evidence. Here, as in the issue relating to representation by counsel discussed above, the first attack on this ground is made upon the appeal. Nevertheless, we address ourselves to the merits of that contention.

At the suppression hearing both appellant and Day testified to the assault upon Day, and this was borne out (at least as to the fact that Day was beaten) by the testimony of the police officer. The testimony as to the alleged beating of appellant is far more sketchy and, at most, indicates that a police officer was *"trying* to hit [appellant] in [his] head." (Emphasis supplied.) But even assuming that appellant suffered some form of physical abuse, that was a month earlier in another county by other police officers. We may not assume that in every arrest to which appellant would thereafter be subjected, no matter how, when or where, any confession would be the product of fear and intimidation. At most it might cause appellant to be wary of accusing a police officer,

record, that the license plate number on the get-away car driven by Atkins played a significant part in Detective Jones' investigation". Our conclusion that the two proceedings were essentially independent is not based on such nontestimonial statements.

in the inner sanctum of a police precinct, of planting incriminatory evidence upon him.

## II. AS TO THE EFFECT OF THE DENIAL OF SUPPRESSION OF POSSESSION OF THE GUN

In the best tradition of the code of ethics of District Attorneys, respondent's counsel candidly admits that the hearing court should have suppressed evidence of the gun.[3] He nevertheless contends, in effect, that the error was harmless in that it "could not reasonably have been the catalyst for appellant's plea of guilty." He points to the following:

1. There is no individual weapons charge in the Queens County proceeding; the sole charge was one of robbery in the first degree (see Penal Law, § 160.15, subd 4). Therefore a case would have been made out against the appellant by the testimony of the complainant, Rohit Shah, that there had been a display of *what appeared to be* a firearm, since a displayed and sufficiently described firearm will be presumed to have been loaded (see *People v Felder,* 39 AD2d 373, 376, affd 32 NY2d 747 on opn of SHAPIRO, J., app dsmd 414 US 948; NY Legis Ann, 1969, p 567);

2. From the notice of photographic identification served upon appellant between the decision after the suppression hearing and the subsequent plea proceeding, appellant was aware of the fact that the People had at least one eyewitness, and appellant did not seek to attack the identification procedure by moving for a *Wade* hearing;

---

3. Respondent's brief states: "Should the court arrive at a similar conclusion, it follows that the gun recovered by Officer McAndrews ought to have been suppressed below, for it only came into his view after, and as a result of the initial unwarranted intrusion, and his demand that the occupants exit the automobile. The fact that appellant suddenly acted as if he was not a member of a group of three persons walking down the street; plus the fact this was a 'high-crime drug area;' plus the fact there was 'a lot of action' inside the suspects' car as it moved down the road; plus the further fact that what 'looked like two white pieces of paper,' believed to be 'alleged glassine envelopes containing heroin,' were seen being tossed out of the car when the flashing police lights were turned on; does not amount to reasonable suspicion, much less specific cause to believe that the occupants had been, were then, or were about to be engaged in criminal activity, the essential prerequisite for a lawful stop. *[Terry v. Ohio,* 392 U.S. 1, 21; *People v. Sobotker,* 43 N.Y.2d 559; *People v. Ingle,* 36 N.Y.2d 413, 418]. In its totality, the conduct observed was, and is, easily susceptible of any number of innocent interpretations [see *People v. Davis,* 36 N.Y.2d 280, 282]; and the fact that McAndrews' instincts were well-founded, and even that he acted in good faith, cannot justify the improperly premises *[sic]* stop [see *People v. Cantor,* 36 N.Y.2d 106, 113]."

3. The two police officers involved in the New York County arrest were at least witnesses to the fact that appellant and Day were seen in each other's company and in the getaway car within two and one-half hours of the Queens robbery and this evidence, albeit circumstantial, would have probative worth;

4. The "damning confessions", when added to the other evidence, would have established guilt beyond all conceivable doubt; and

5. The fact that appellant waited almost three and one-half months after denial of the suppression motion to enter his plea indicates that he believed the denial of his motion to suppress the gun was of minor significance.

In sum, contends the District Attorney (citing *People v Ramos,* 40 NY2d 610, 619), the failure to suppress the gun was "not 'a likely factor which might have induced the plea and might have affected substantially a verdict upon trial'" so that the error was harmless beyond a reasonable doubt and "there is no 'reasonable possibility' that it contributed to the conviction *[Chapman v. California,* 386 U.S. 18, 22-24; see *People v. Crimmins,* 36 N.Y. 2d 230, 237]".

In analyzing these contentions we have most reluctantly concluded that the recent case of *People v Grant* (45 NY2d 366, *supra,* to which neither of the parties referred) mandates reversal on this issue. There a pretrial motion to suppress a *confession* was denied, and after the People rested their case at the trial the defendant pleaded guilty to the murder count of an indictment charging him with murder and possession of a weapon. The court held that the confession should have been suppressed because defendant should not have been questioned after he had requested the assistance of counsel. The People argued, as they do here, that the error was harmless. The court stated *(supra,* pp 377-378): "In no case where the defendant has pleaded guilty have we held that an erroneous denial of a pretrial motion to suppress was harmless error (cf. *People v Ramos, supra* [40 NY2d 610, 618-619]) * * * Because harmless error rules were formulated to review trial verdicts, they are difficult to apply to guilty pleas." The court then stated *(supra,* pp 379-380):

"When the conviction is based on a plea—instead of a verdict—the question must at least be reformulated to determine whether there is a reasonable possibility that the error

contributed to the plea (cf. *People v Ramos,* 40 NY2d 610, 618-619, *supra*).

"*This question however is one which an appellate court is rarely equipped to answer without resorting to speculation.* Unlike a verdict, which must necessarily be based exclusively on the evidence submitted at trial, a defendant's decision to plead guilty may be based on any factor inside or outside the record. Thus a conviction based on a plea of guilty simply reflects the fact that for some reason, sufficient to the defendant, he decided to waive his trial rights (see, e.g., *North Carolina v Alford,* 400 US 25; *People v Serrano,* 15 NY2d 304, 310). His decision of course may be based on knowledge of the People's case but, perhaps more frequently, it is based on ignorance and fear of what the prosecutor may know about this, or other offenses. A defendant may also decide to plead because of feelings of guilt, or merely because he does not want to risk a conviction for a higher offense or wishes to spare his family or himself the ordeal of a trial, although he may be firmly convinced of his own innocence (see, e.g., *North Carolina v Alford, supra; People v Serrano, supra*). And of course he may decide to plead and take an appeal because he believes that he cannot succeed at trial unless certain evidence is suppressed (see *Lefkowitz v Newsome,* 420 US 283, 292).

"The People urge that on the record it can be determined that the denial of the motion played no part in the defendant's decision to plead because he did not plead guilty immediately after the motion was denied, and only did so after the People had submitted their proof at trial. But the proof at trial included the confession, and we cannot rule out the possibility that the defendant concluded that he could not prevail in the face of all the evidence. Notably, at the time of plea he did not waive his right to appeal and have the confession suppressed and a new trial granted (see *People v Williams,* 36 NY2d 829).

"In sum, *when a conviction is based on a plea of guilty an appellate court will rarely, if ever, be able to determine whether an erroneous denial of a motion to suppress contributed to the defendant's decision, unless at the time of the plea he states or reveals his reason for pleading guilty.*[4] This is

---

4. Here, at the times of plea and of sentence, defendant did not reveal his reason for pleading guilty. In the plea hearing the court stated: "Ordinarily, a C felony is a sentence up to 15 years. However, there has been a discussion with the district

especially true when the defendant has unsuccessfully sought to suppress a confession *(People v Ramos, supra,* pp 618-619)" (emphasis supplied).

A rational argument may be made that there is an important distinction between the improper introduction of a confession and the submission, as an exhibit, of an unfired gun allegedly used in a robbery. A confession has a devastating effect and it is extremely unlikely that a jury would find the defendant not guilty under such circumstances, especially where the confession was tape recorded. So devastating and so " 'high in the scale of incriminating evidence' " *(Miranda v Arizona,* 384 US 436, 442; see, also, *People v Ramos,* 40 NY2d 610, 618, 619, *supra)* is a confession that it is unlikely a jury would have been swayed by the slight make-weight evidence of the fact that appellant was found to be in the possession of an unfired gun several hours after the robbery. Thus, it may be argued that *Grant* is based on the overwhelming significance of a *confession,* and that the essence of its holding *supports* the People's contention that the gun could play no significant role but was as unimportant as a feather attached to a pile driver. But we are not dealing with objective logic when we seek to determine the workings of a defendant's mind in deciding whether or not to plead guilty. It may well be that the appellant realized that the admission of his confession, when added to the identification testimony of an eyewitness plus other possible proof, such as the license plate number of the getaway car, foredoomed any possible defense so that whether the gun could be physically introduced as an exhibit at the trial would be of scant consequence. However, a decision to plead guilty is one of the most solemn and personal rights that a person has and, rationally or irrationally, it is his decision, and his alone to make. Thus, following as we must, the caveat of *People v Grant* (45 NY2d 366, 379-380, *supra),* that "when a conviction is based on a plea of guilty an appellate court will rarely, if ever, be able to determine whether an erroneous denial of a motion to suppress contributed to the defendant's decision", the judgment should be

---

attorney and your lawyer. It was agreed that the maximum sentence would not be over 7 years. That's a D felony. It could be less, but it won't be over." This was the probable reason for his plea, but *we cannot be certain* that he was not influenced by the belief that a verdict of guilty (if he went to trial) was more likely because of the admissibility of his possession of a gun two and one-half hours after the robbery.

reversed, and the motion to suppress should be granted insofar as it related to possession of the gun.[5]

MOLLEN, P. J., HOPKINS and MARTUSCELLO, JJ., concur.

Judgment of the Supreme Court, Queens County, rendered June 30, 1977, reversed, on the law and facts, motion to suppress granted to the extent that the weapon is suppressed, and the case is remitted to Criminal Term for further proceedings consistent herewith.

---

5. I iterate what I stated in *People v Navarro* (61 AD2d 534, 536): "Is it too much to say to a defendant that if he wants to attack the invalidity of the suppression order he may only do so after standing trial?" I recognized there that this is a matter for the Legislature, but *(supra,* p 536) that "the time has come for the Legislatue to consider the advisability of amending the statute so as to preclude appeals under such circumstances." This case illustrates the wisdom of such amendment. Here, the appellant is in a position to require the State to go to the expense of a new trial in which he is almost certainly doomed to defeat *if the People's witnesses are still available.* We hold that this is his absolute right but it should also be the right of the State, by legislation, to require a defendant to make his election. By taking a plea to a lesser offense, he expects to, and usually does receive the benefit of a substantially lesser sentence. I believe it is not too much to ask that in return he should not put the State to the hazard (and expense) of a trial which, in many cases, will be held years after the offense, at which time the People's witnesses may not be available. There should be a fair *quid pro quo.* In the absence of such amendment District Attorneys would be well advised to require the defendant to waive his right to raise on appeal the denial of his suppression motion as a condition to the acceptance of a plea of guilty (see *People v Williams,* 36 NY2d 829, 830; *People v Esajerre,* 35 NY2d 463, 468-469; *People v Grant,* 45 NY2d 366, 379, *supra; People v Navarro, supra,* p 536).